SO ORDERED: February 21, 2014.



_____
James M. Carr
United States Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| DONALD LYNN MALCOM, | ) | Case No. 12-00038-JMC-7 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| CADLES OF GRASSY MEADOWS II, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary Proceeding No. 12-50139 |
| | ) | |
| DONALD LYNN MALCOM, | ) | |
| | ) | |
| Defendant. | ) | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

THIS MATTER came before the Court for a bench trial on October 23, 2013. Plaintiff Cadles of Grassy Meadows II, LLC ("Cadles") appeared by counsel Steven D. Groth and Weston E. Overturf. Defendant Donald Lynn Malcom ("Malcom") appeared by counsel Niccole R.

Sadowski. Prior to the trial, the parties stipulated that Malcom's counterclaim would be bifurcated and addressed, if applicable, after the trial by motion and/or hearing at the Court's discretion.

During the trial, Cadles moved the admission of documents marked for identification purposes as "Exhibit N" and "Exhibit O." The Court directed the parties to file post-trial briefs as to the admissibility of such exhibits on or before November 8, 2013.

This matter was taken under advisement at the conclusion of the trial with the parties invited to submit proposed findings of fact and conclusions of law on or before November 8, 2013.

The Court, having reviewed the evidence presented at the trial, Proposed Stipulations Of Fact filed by the parties on October 21, 2013 (Docket No. 73) ("Stipulation"), Cadles Of Grassy Meadows II, LLC's Brief On The Admissibility Of The Deposition Of Christopher Yale Malcom filed on November 8, 2013 (Docket No. 76) ("Cadles' Brief"), Defendant's Brief In Opposition To Admission Of Christopher Malcom's Prior Deposition Testimony filed on November 8, 2013 (Docket No. 77) ("Malcom's Brief"), the proposed findings of fact and conclusions of law timely submitted by the parties, and the other matters of record in this adversary proceeding; having heard the presentations of counsel at the trial; and being otherwise duly advised, now makes a ruling on the admissibility of Exhibits N and O and enters the following findings of fact and conclusions of law as required by Fed. R. Civ. P. 52, made applicable to this adversary proceeding by Fed. R. Bankr. P. 7052.

### Admissibility of Exhibits N and O

Exhibit N is a copy of excerpts from the transcript of a videotaped deposition of Christopher Yale Malcom ("Chris") taken on January 20, 2011 in the case captioned <u>Cadles of</u>

Grassy Meadows II, LLC v. Donald Malcom, Cause No. 49D04-1001-CC-001958, then pending before the Marion Superior Court (the "State Court Case").

Exhibit O is a copy of a Plea Agreement between the United States of America and Chris dated November 2, 2010 in the case captioned United States of America v. Chris Malcom, Case No. 8:10-CR-463-T-24-EAJ, then pending before the United States District Court for the Middle District of Florida, Tampa Division. At trial, counsel for Cadles acknowledged that the evidentiary foundation for Exhibit O is laid in Exhibit N. If Exhibit N is not admitted, counsel indicated that he would withdraw his motion to admit Exhibit O.

In their respective briefs, Cadles and Malcom focus on Fed. R. Civ. P. 32(a)(8), made applicable to this adversary proceeding by Fed. R. Bankr. P. 7032, as governing the admissibility of Exhibit N.[1] It provides:

> (8) ***Deposition Taken in an Earlier Action.*** A deposition lawfully taken and, if required, filed in any federal- or state-court action may be used in a later action involving the same subject matter between the same parties, or their representatives or successors in interest, to the same extent as if taken in the later action. A deposition previously taken may also be used as allowed by the Federal Rules of Evidence.

There is no dispute as to Chris' deposition having been lawfully taken and filed in the State Court Case before the commencement of this adversary proceeding; nor is there a question that both Cadles and Malcom were parties in the State Court Case. The focus of the dispute, then, is on whether the State Court Case and this adversary proceeding involve the "same subject

---

[1] In Cadles' Brief, Cadles does not address the requirements of Fed. R. Civ. P. 32(a)(1)(A) and (B). Malcom does. See Malcom's Brief, p. 4. As to Fed. R. Civ. P. 32(a)(1)(A), Malcom acknowledges he had reasonable notice of the deposition's time and place; however, he claims that he was not given the "required" notice because he "had no notice of Cadles' true intentions for the Deposition and/or use of the Deposition to pursue fraud claims and in anticipation of filing the Adversary." Malcom's Brief, p. 4. Malcom does not cite any authority for that proposition. The Court is not persuaded and finds that argument to be better suited to the "same subject matter" analysis required by Fed. R. Civ. P. 32(a)(8). As to Fed. R. Civ. P. 32(a)(1)(B), Malcom claims that "Cadles has not designated any testimony it wished to use." Malcom's Brief, p. 4. Cadles filed Plaintiff's Designation Of Deposition Testimony on October 22, 2013 (Docket No. 74), which included designations of Chris' deposition. Fed. R. Civ. P. 32(a)(1)(C) points us to subsection (a)(8), which is where the Court will focus its attention.

matter."

Citing Ikerd v. Lapworth, 435 F.2d 197, 205 (7th Cir. 1970) and other cases, the Ninth Circuit Court of Appeals articulated the inquiry as follows:

> Rule 32(a) requires that the prior and present lawsuits involve the "same subject matter" and "the same parties or their representatives or successors in interest." These requirements have been construed liberally in light of the twin goals of fairness and efficiency. The accepted inquiry focuses on whether the prior cross-examination would satisfy a reasonable party who opposes admission in the present lawsuit. Consequently, courts have required only a substantial identity of issues, … and the presence of an adversary with the same motive to cross-examine the deponent[2] … .

Hub v. Sun Valley Co., 682 F.2d 776, 778 (9th Cir. 1982) (citations omitted). In that case, Mr. Hub "failed to show that the deposition relates to issues common to both lawsuits." Id. Mr. Hub wanted to use a deposition taken in a prior lawsuit to show that his employer decided not to rehire him in retaliation for his filing an EEOC complaint; however, retaliation was not at issue in the prior lawsuit, so there was no reason to cross-examine the deponent about it. Id. "It would be unfair to bind Sun Valley by the prior cross-examination which did not cover the issue of retaliation." Id.

One lending transaction – applying for, underwriting, closing and funding the Loan Debt (as defined below) – gives rise to Cadles' claims, both in the State Court Case and in this adversary proceeding. However, because there is a significant difference between a "suit on the note" (the State Court Case) and a determination of the dischargeability of the Loan Debt under federal bankruptcy law (this adversary proceeding), the Court finds that there is not a substantial identity of issues. Whether a debt is dischargeable under federal bankruptcy law does not

---

[2] This language is very similar to Fed. R. Evid. 804(b)(1)(B). While not specifically discussed at the trial, Malcom cited to the Court a decision – Oberlin v. Marlin American Corp., 596 F.2d 1322, 1329 (7th Cir. 1982) – referring to that evidentiary rule. Malcom's Brief, p. 5. As explained below, the Court finds that there is no substantial identity of issues between the State Court Case and this adversary proceeding. Thus, it logically flows therefrom that Malcom did not have the same motive to cross-examine Chris during the deposition.

become an issue until a bankruptcy petition is filed. Chris' deposition was taken January 20, 2011, almost one year before Malcom filed his bankruptcy petition on January 4, 2012. Therefore, at the time the deposition was taken, the issue being litigated did not directly or tangentially involve or relate to whether the Loan Debt that Malcom allegedly owed to Cadles should be excepted pursuant to § 523(a)(2) or (6) (as originally pleaded) from a general discharge in bankruptcy. As in <u>Hub</u>, where retaliation was not an issue in the prior lawsuit, dischargeability was not an issue in the State Court Case.

Without a substantial identity of issues and the opportunity to cross-examine Chris with regard to facts underlying a dischargeability claim, the Court will not admit Exhibit N into evidence at the trial of this adversary proceeding. Based on Cadles' counsel's representations at the trial, the Court will treat Exhibit O as withdrawn.

### Findings of Fact

Cadles and Malcom stipulated to the following facts:[3]

1.    On January 4, 2012, Malcom filed a Voluntary Petition under Chapter 7 of the United States Bankruptcy Code, 11 U.S.C. § 101 <u>et seq.</u> (the "Bankruptcy Code"),[4] in the United States Bankruptcy Court for the Southern District of Indiana, Indianapolis Division.

2.    On April 23, 2012, Cadles filed the Complaint To Determine Dischargeability initiating this adversary proceeding and is seeking nondischargeability pursuant to § 523(a)(2).[5]

---

[3]     See Stipulation. Revisions to the Stipulation have been made to condense the content thereof, to reflect terms defined herein or, in the case of the amount of the debt at issue, update it to the date of the trial.

[4]     All statutory references are to the Bankruptcy Code unless otherwise noted.

[5]     See Stipulation, ¶ 3. Also, in the course of briefing the summary judgment motion filed by Malcom, Cadles acknowledged that it is no longer pursuing a nondischargeability determination under § 523(a)(6). Cadles Of Grassy Meadows II, LLC's Response To Defendant's Motion For Entry Of Partial Summary Judgment filed on June 11, 2013 (Docket No. 42), p. 11, n.6.

3. Malcom filed his Answer To Plaintiff's Complaint To Determine Dischargeability And Counterclaim with affirmative defenses on June 25, 2012 (Docket No. 10) asserting defenses and seeking relief as stated therein.

4. On January 14, 2010, Cadles filed the State Court Case seeking to collect on a promissory note (the "Note").

5. In or about 2001 Chris and one or more other individuals formed a business venture (the "Investment Group") for the purpose of investing in real estate.

6. In or about 2002 Chris initially contacted Malcom regarding investing in the Investment Group.

7. In or about 2004 Malcom agreed to invest in the Investment Group and contributed $30,000 for that purpose.

8. On January 25, 2006, real estate commonly known as 118 Leeward Island, Clearwater Beach, Florida 33767 (the "Real Estate") was purchased in Malcom's name.

9. The closing on the Note, submitted to the Court among the Joint Exhibits for the trial of this adversary proceeding (the "Joint Exhibits"), occurred on January 25, 2006 (the "Closing").

10. On or about January 25, 2006, Metrocities Mortgage, LLC n/k/a Prospect Mortgage, LLC ("Metrocities") funded the entire principal balance of the Note, and there were no further draws or disbursements made pursuant to the Note.

11. At the Closing, on January 25, 2006, a Uniform Residential Loan Application (the "Application"), submitted to this Court among the Joint Exhibits, was submitted to Metrocities.

12. On January 25, 2006, Malcom's income was not in the amount of $50,000.00 per month.

13. The Note is a stated income loan and the borrower's (Malcom's) income was not verified.

14. On April 4, 2006, Malcom executed four (4) Powers of Attorney, submitted to this Court among the Joint Exhibits.

15. On April 4, 2006, Malcom executed a Property Management Agreement, submitted to this Court among the Joint Exhibits.

16. On August 8, 2006, Malcom executed a Property Management Agreement, submitted to this Court among the Joint Exhibits.

17. At some time after April 4, 2006, Malcom had knowledge that there were two mortgages on the Real Estate and that his name was on the loans used to obtain the Real Estate.

18. At some time during the summer of 2006, Malcom visited the Real Estate, and he knew, at that time, the Real Estate had been titled in Malcom's name.

19. Malcom never used the Real Estate as his secondary residence.

20. Malcom was aware, two (2) to three (3) years after the Note was executed and delivered to Metrocities, that the Investment Group did not have funds to pay the Note.

21. Cadles is the successor in interest to Metrocities and the holder of the Note (and the debt evidenced thereby (the "Loan Debt")).

22. As of the date of trial, the amount of the Loan Debt is $349,261.79, consisting of $259,834.39 in principal, $89,287.40 in accrued interest, and $140 in late fees. Interest continues to accrue at a per diem rate of $34.28.

The Court makes the following additional findings of fact:

*Malcom's Investments, Generally*

23. When Chris wanted Malcom to consider investing in a particular property, the

normal procedure included (a) Chris calling Malcom and describing the property; (b) if Malcom was willing to consider the property, Chris would send documents regarding the property to Malcom, including a loan application; (c) if Malcom was interested in "moving forward" toward the purchase of such property after reviewing the documentation provided by Chris, Malcom would complete the loan application and send it to Chris along with other required documents, such as financial account records and tax returns; and (d) if the loan was approved, Chris would send Malcom a "power of attorney" to execute so the purchase/financing could proceed to closing (collectively, the "Normal Procedure").

24.    Each of the powers of attorney Malcom executed only appointed Chris, and not any other person or entity, as Malcom's attorney in fact for the purposes described in the power of attorney document. Malcom did not authorize the Investment Group to proceed to any closing without a power of attorney, nor did Malcom think it was possible to proceed to any closing without a power of attorney.

25.    For each property purchased in Malcom's name, Malcom executed a property management agreement that delineated Malcom's and the Investment Group's respective responsibilities, how profits would be shared, and how disputes would be settled. One of the Investment Group's responsibilities was to collect the rents and use such funds to make the monthly loan payments.

26.    For the properties he owned, Malcom intended to make payments on the loans associated with those properties through the Investment Group pursuant to the terms of the applicable property management agreement.

27.    Malcom was the owner of multiple properties purchased via the Investment Group prior to the purchase of the Real Estate. The loans with regard to each of those properties

were satisfied.

*Malcom's Investment in the Real Estate*

28. At the time of Closing, Malcom's income was approximately $120,000/year or $10,000/month.

29. Chris contacted Malcom in late February-early April 2006 regarding the Real Estate. Malcom completed a loan application to borrow money for the purchase of the Real Estate and sent it to Chris. Malcom thought the Real Estate was purchased in April 2006.

30. Malcom did not know that the Real Estate was purchased in his name or that the Closing had occurred *prior to* (a) his being contacted by Chris to consider a purchase of the Real Estate, and (b) Malcom's completing a loan application with respect to Real Estate.

31. Malcom did not attend the Closing and did not execute any of the documents submitted to Metrocities in connection with the Loan Debt or the Closing. Specifically, (a) the loan application Malcom believes he completed was not the Application submitted to Metrocities at the Closing, and Malcom did not authorize anyone to complete or sign the Application, or make the representations contained therein, on his behalf; and (b) Malcom did not complete and sign, or authorize anyone to complete and sign, the second home rider, false statement/ employment/occupancy form, general affidavit and affidavit of occupancy (collectively, the "Other Closing Documents"), or make the representations contained therein, on his behalf.

32. Malcom did not execute a power of attorney authorizing the Closing documents to be signed in his name *prior to* the Closing.

33. Malcom intended to make payments on the Loan Debt through the Investment Group pursuant to the terms of the property management agreement with respect to the Real Estate. Cadles received 13 payments in the approximate amount of $2,082 each toward the Loan

Debt.

34.     Malcom received $80,000 in January, 2005 from the Investment Group with respect to a different property. When Chris advised Malcom that the Investment Group could not make payments on the Loan Debt, Malcom returned the $80,000 to the Investment Group so it could make the mortgage payments on the Loan Debt. There is no evidence in the record showing that the $80,000 was used to pay down the Loan Debt.

35.     Malcom did not contemplate the Investment Group's failing entirely, but understood that if it did, he was obligated under the Note.

36.     Malcom had no knowledge of, and had not seen, the Application until July 2010. When Malcom became aware of the Application as part of the discovery process in the State Court Case and the errors it contained, he or his counsel immediately contacted Cadles.

## Conclusions of Law

1.      Any finding of fact above will also be a conclusion of law, and any conclusion of law will also be a finding of fact to support the judgment of the Court.

### *Jurisdiction and Venue*

2.      This court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 157 and 1334.

3.      This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

4.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

*Exceptions to Discharge*

5.　　Exceptions to discharge under § 523 "are to be construed strictly against a creditor and liberally in favor of the debtor." In re Zarzynski, 771 F.2d 304, 306 (7th Cir. 1985). "The burden is on the objecting creditor to prove exceptions to discharge." Goldberg Securities, Inc. v. Scarlata (In re Scarlata), 979 F.2d 521, 524 (7th Cir. 1992) (citation omitted). The burden of proof required is a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 291, 111 S.Ct. 654, 661 (1991).

6.　　Section 523(a) provides, in relevant part:

> A discharge under section 727 … of this title does not discharge an individual debtor from any debt –
>
> (2)　for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –
> 　　(A)　false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
> 　　(B)　use of a statement in writing –
> 　　　　(i)　that is materially false;
> 　　　　(ii)　respecting the debtor's or an insider's financial condition;
> 　　　　(iii)　on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
> 　　　　(iv)　that the debtor caused to be made or published with intent to deceive; …

7.　　The Seventh Circuit has noted material differences among the three possible grounds for nondischargeability under § 523(a)(2)(A) and has formulated two different tests, one for both "false pretenses" and "false representation" and another for "actual fraud." Rae v. Scarpello (In re Scarpello), 272 B.R. 691, 699-700 (Bankr. N.D. Ill. 2002) (citing McClellan v. Cantrell, 217 F.3d 890, 894 (7th Cir. 2000)).

*False Representation*[6]

§ 523(a)(2)(A)

8.  To prevail on a nondischargeability claim under the "false representation" theory, a creditor must prove all of the following elements: "(1) the debtor made a false representation or omission, (2) that the debtor (a) knew was false or made with reckless disregard for the truth and (b) was made with the intent to deceive, (3) upon which the creditor justifiably relied." Ojeda v. Goldberg, 599 F.3d 712, 716-17 (7th Cir. 2010).

9.  A "false representation" is an express misrepresentation that can be shown by the debtor's written statement, spoken statement or conduct. Deady v. Hanson (In re Hanson), 432 B.R. 758, 772 (Bankr. N.D. Ill. 2010) (citing Bletnitsky v. Jairath (In re Jairath), 259 B.R. 308, 314 (Bankr. N.D. Ill. 2001)). "A debtor's failure to disclose pertinent information may be a false representation where the circumstances imply a specific set of facts and disclosure is necessary to correct what would otherwise be a false impression." Id. (citing Trizna & Lepri v. Malcolm (In re Malcolm), 145 B.R. 259, 263 (Bankr. N.D. Ill. 1992)). "An intentional falsehood relied on under § 523(a)(2)(A) must concern a material fact." Scarpello, 272 B.R. at 700 (citing Jairath, 259 B.R. at 314).

§ 523(a)(2)(B)

10.  "In order to prevail on a claim under 11 U.S.C. § 523(a)(2)(B), a creditor must prove by a preponderance of the evidence that a debtor made, with an intent to deceive, a

---

[6] Cadles' allegations and the Bankruptcy Code sections applicable thereto were fleshed out in the course of briefing and ruling on the cross motions for summary judgment filed in this adversary proceeding last year. See Entry On Cross Motions For Summary Judgment entered on August 26, 2013 (Docket No. 59) (the "Summary Judgment Entry"). Therefore, the false representation allegations based on the Other Closing Documents will be considered under § 523(a)(2)(A). See Summary Judgment Entry, ¶ 11. The false representation allegations based on the Application will be considered under § 523(a)(2)(B) because the Application is a statement respecting financial condition. See Summary Judgment Entry, ¶¶ 10, 12.

materially false written statement regarding his financial condition and that the creditor relied on that statement." Matter of Sheridan, 57 F.3d 627, 633 (7th Cir. 1995).

11.     "Material falsity has been defined as 'an important or substantial untruth.'" Matter of Bogstad, 779 F.2d 370, 375 (7th Cir. 1985) (citations omitted). "A recurring guidepost used by courts has been to examine whether the lender would have made the loan had he known of the debtor's true financial condition." Id. (citations omitted). This guidepost is sometimes referred to as the "*causa sine qua non*" or "but for" test. Selfreliance Fed. Credit Union. v. Harasymiw (In re Harasymiw), 895 F.2d 1170, 1172 (7th Cir. 1990).

Reasoning

12.     The parties stipulated to the falsity of (a) the statement contained in the Application that Malcom made $50,000/month; and (b) the statement contained in the Other Closing Documents that Malcom intended to use the Real Estate as his second residence. See Findings of Fact, ¶¶ 12, 19.[7] However, neither party directly addressed the materiality of those false statements in the papers they filed with or submitted to the Court.

13.     As to Malcom's monthly income, the Court concludes that the Application contained a materially false statement. "Materiality is determined in part by the size of the discrepancy." Enterprise Nat'l Bank of Atlanta v. Jones (In re Jones), 197 B.R. 949, 960 (Bankr. M.D. Ga. 1996). Malcom's income was approximately $10,000/month as of January 25, 2006 (the date on the Application) – a fraction of the $50,000/month income

---

[7]     This stipulation mirrors what the Court observed at the summary judgment phase – "It also appears from the pleadings that the parties do not dispute the falsity of two statements: (a) Malcom did not make $50,000 per month …; and (b) Malcom did not intend to, and did not, use the Property as his second residence … ." Summary Judgment Entry, ¶ 21. The Court made no findings or holdings with regard to the materiality of the statements during the summary judgment phase.

figure included in the Application. That certainly amounts to a "substantial untruth." Moreover, Veronica Moskowitz's deposition testimony noted that "the qualifying method on a stated income verified assets loan is income supplied by the customer, not verified, and we verify the assets, the credit report, and the appraisal" (Joint Exhibit 4, Transcript 34:4-7), which further supports the materiality of the false representation as to Malcom's income.

14.     As to using the Real Estate as Malcom's second residence, the Court concludes that such representation was not materially false. Based on the evidence presented, the Court cannot find support for Cadles' position that representing that the Real Estate would be used as Malcom's second residence when in fact it would not be so used constituted a materially false representation (e.g., Metrocities would not have loaned the money if it had known the true use of the Real Estate; the loan would have been priced differently; there would have been different underwriting conditions; etc.). Therefore, while an express misrepresentation was made in the Other Closing Documents that Malcom would use the Real Estate as a second residence, the Court does not find such misrepresentation to be material.

15.     Accordingly, the Court will limit its false representation analysis to the Application under § 523(a)(2)(B).[8]

Intent to Deceive Metrocities

---

[8]     As noted in the Summary Judgment Entry (¶ 22(b)) and raised again in Cadles' proposed findings of fact and conclusions of law (p. 12), there was a question as to whether Malcom falsely represented his intent to repay the Loan Debt. Cadles further suggested in its proposed findings of fact and conclusions of law (p. 11) that listing Malcom as the "borrower" on the Note was itself a false representation. Malcom arranged for the property manager he retained for the Real Estate to pay the Loan Debt from the revenue the Real Estate was expected to generate. Thus, the Court concludes that those two statements are not false statements under the Hanson definition because they are not express misstatements, nor do they give a false impression of who is obligated on the Note. They may, however, relate to whether Malcom intended to deceive Metrocities, which will be addressed below.

16. Having established that a materially false representation was made, the Court will turn to whether the debtor – Malcom, in this case – made the false representation with the intent to deceive Metrocities as required by both the Ojeda and Sheridan tests.

17. A debtor's intent to deceive (as required under both the false representation and actual fraud theories) "is measured by a debtor's subjective intention at the time the representation was made." Scarpello, 272 B.R. at 700 (citing Mercantile Bank v. Canovas, 237 B.R. 423, 428 (Bankr. N.D. Ill. 1998)). Additionally, "[b]ecause direct proof of fraudulent intent is often unavailable, fraudulent intent may be inferred from the surrounding circumstances." Hanson, 432 B.R. at 773 (internal citations omitted). See also Sheridan, 57 F.3d at 633 (quoting In re Kimzey, 761 F.2d 421, 424 (7th Cir. 1985) (intent to deceive can be proven through direct evidence, or wrongful intent may "logically be inferred from a false representation which the debtor knows or should know will induce another to make a loan")).

18. Based on the evidence presented, the Court concludes that Malcom did not personally make a false representation with the intent to deceive Metrocities. Malcom offered credible, uncontested testimony that he did not complete or sign the Application and that he did not attend the Closing. At the time the false representation was made – January 25, 2006 – Malcom had not yet been approached by Chris with respect to purchasing the Real Estate, which would have been the first step in the Normal Procedure; Malcom had not yet completed a loan application; Malcom had not yet completed a power of attorney so that closing documents could be executed on his behalf; and Malcom did not know that the Real Estate had already been purchased in his name.

When Malcom learned in July 2010 that the Application contained false information, he or his counsel immediately notified Cadles.

19. In addition, there is no evidence that Malcom gave Chris and/or the Investment Group "blanket" authority to conduct business on his behalf as Chris and/or the Investment Group saw fit. Rather, the Normal Procedure that was followed when Chris wanted Malcom to consider investing in a property was property-specific and happened multiple times. Malcom reviewed information on each property individually. Each property had its own set of documents, such as a loan application completed by Malcom, supporting financial documentation, a power of attorney completed in advance of the closing, and a property-specific property management agreement. Malcom understood that the properties were titled in his name and loans were obtained in his name. Following this Normal Procedure at least four times with respect to four different properties did not raise any red flags for Malcom.

20. There was, however, a deviation from the Normal Procedure with regard to the Real Estate – Chris did not present the property to Malcom for consideration *in advance* of the Closing. Evidence to the contrary was not introduced. This deviation is significant, and it undermines Cadles' three overlapping arguments made at trial (and/or included in its proposed findings of fact and conclusions of law (pp. 16-22)) that Malcom either had the requisite intent to deceive or the intent to deceive should be imputed to him: (1) Malcom was recklessly indifferent to what Chris and/or the Investment Group was doing in his name; (2) Malcom engaged in "fraud through ratification;" and (3) an agency relationship existed between Malcom (principal) and Chris (agent). The Court is not persuaded.

21.     A "knew or should have known" standard can be applied for Cadles' reckless indifference and agency arguments.  See Northern Trust Co. v. Garman (In re Garman), 643 F.2d 1252, 1260-61 (7th Cir. 1980) (quotation omitted) ("where … a person knowingly or recklessly makes a false representation which the person knows or should know will induce another to make a loan, intent to deceive may be logically inferred"), and James Cape & Sons Co. v. Bowles (In re Bowles), 318 B.R. 129, 145 (Bankr. E.D. Wisc. 2004) (citation omitted) ("in the context of a § 523(a) nondischargeability action, fraud will be imputed to the principal only if it is proven that he knew or should have known of the fraud"), respectively.  Based on the evidence presented, the Court concludes that Malcom did not know (a) that Chris and/or the Investment Group had made false a representation to Metrocities in the Application with respect to Malcom's income; (b) that Chris was acting outside the Normal Procedure; and (c) that the Closing occurred prior to Chris' approaching Malcom about investing in the Real Estate.  The Court further concludes that Malcom should/could not have known of the false representation because (a) Malcom had no reason to know Chris and/or the Investment Group had submitted the Application, particularly where Malcom completed an application pursuant to the Normal Procedure (in other words, Chris did not tell Malcom not to complete an application because it was unnecessary); (b) there were only a few short months between the actual date of the Closing and the date Malcom thought he purchased the Real Estate (early April, 2006), presenting Malcom with little opportunity to discover the false representation and the "breach" in the Normal Procedure; and (c) there was no evidence presented that there was a problem with the Loan Debt[9] that would have required heightened scrutiny by Malcom.

---

[9]     Malcom was aware that the Investment Group did not have funds to make payments on the Loan Debt two

22. In its proposed findings of fact and conclusions of law (p. 21), Cadles points the Court to Barber v. First Nat'l Bank of Chillicothe (In re Ostrom-Martin, Inc.), 202 B.R. 267, 274 (Bankr. C.D. Ill. 1996) (quotation omitted), highlighting the following language:

> Ratification is the equivalent of authorization, but it occurs after the fact, when a principal gains knowledge of an unauthorized transaction but then retains the benefits or otherwise takes a position inconsistent with nonaffirmation. Generally, the question of ratification turns on the principal's intent to affirm.

By this definition, Cadles' argument fails. When Malcom signed the powers of attorney and property management agreements in April 2006, he did not know that the Closing had already occurred in January 2006. Between January 25, 2006 and April 4, 2006, he did not "gain knowledge of an unauthorized transaction" such that he ratified the unauthorized transaction by signing the powers of attorney and property management agreements in April. When Malcom went through what he thought was the Normal Procedure with regard to the Real Estate in the February-April 2006 timeframe, he thought he was acting contemporaneously or prospectively, not "after the fact," with regard to the purchase and financing of the Real Estate. When Malcom first learned of the Application in July 2010, he took immediate steps to notify Cadles – a position *inconsistent* with affirmation.

23. Therefore, the Court further concludes that an intent to deceive cannot be imputed to Malcom.

24. Having concluded that a materially false representation was made, but it was not made by, or imputable to, Malcom with an intent to deceive Metrocities, the

---

to three years after the Note was executed. See Findings of Fact, ¶ 20. In and of itself, however, that is not enough to suggest that Malcom knew or should have known therefrom that a false representation was made in the Application and is therefore an insufficient basis to impute the intent to deceive to him.

Court does not need to reach the issue of whether Metrocities justifiably relied on the false representation.

*Actual Fraud*

25.     "[A]ctual fraud is broader than misrepresentation," McClellan, 217 F.3d at 893, in that neither a debtor's misrepresentation nor a creditor's reliance is necessary to prove nondischargeability under the "actual fraud" ground of § 523(a)(2). Scarpello, 272 B.R. at 700 (citing McClellan, 217 F.3d at 894). "Actual fraud" is defined as "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another" which includes "all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated." McClellan, 217 F.3d at 893 (internal citations omitted). In such cases, a creditor must prove "(1) a fraud occurred; (2) the debtor intended to defraud the creditor; and (3) the fraud created the debt that is the subject of the discharge dispute." Hanson, 432 B.R. at 772 (citing McClellan, 217 F.3d at 894).

26.     Prongs (1) and (3) of the Hanson test are satisfied. It is not difficult to conclude under the McClellan definition that a fraud occurred (Metrocities was deceived) creating the Loan Debt.

27.     The second prong described in Hanson is not met, however. For the reasons described in Conclusions of Law, ¶¶ 16-23 above, the Court concludes that Malcom did not intend to deceive Metrocities, and that intent should not be imputed to Malcom.

*Conclusion*

28.     Based on the foregoing, the Court concludes that Cadles has not proven by a preponderance of the evidence that the Loan Debt should be excepted from discharge pursuant to § 523(a)(2)(A) or (B), and therefore the Loan Debt owed by Malcom to Cadles is  DISCHARGEABLE.  The Court will enter judgment in favor of Donald Malcom and against Cadles of Grassy Meadows II, LLC consistent with these findings of fact and conclusions of law contemporaneously herewith.

29.     The Court will issue a notice setting a telephonic status conference with respect to the counterclaim.

# # #